497 A.2d 1164

Larry Ramoun STANDIFUR

v.

STATE of Maryland.

No. 30, Sept. Term, 1985.

Court of Special Appeals of Maryland.

Oct. 4, 1985.

572

Melissa M. Moore, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Valerie J. Smith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, John L. Scarborough, State's Atty. for Cecil County, and David H. Parrack, Asst. State's Atty. for Cecil County, Elkton, on brief), for appellee.

Argued before GILBERT, C.J., and WEANT and GARRITY, JJ.

WEANT, Judge.

On 16 November 1984 a Cecil County jury found appellant Larry Ramoun Standifur guilty of daytime housebreaking and theft over $300. Appellant's motion for new trial was denied on 4 January 1985. The following questions are presented on appeal:

1. Did the trial court err in admitting into evidence the extrajudicial statement of James Clyde Richard?

2. Was the trial court's instruction regarding the inference to be drawn from Appellant's possession of a stolen gun reversible error?

For the reasons stated below, we reverse and remand for a new trial.

### Facts

During the daytime hours on 2 September 1983, the home of Lynn and Dale Jackson was entered and several items were taken. Mrs. Jackson testified that she locked the doors before she left for work in the morning; when she returned home the house had been broken into. At trial, Mr. Jackson identified a small shotgun, introduced by the State, as one of the items stolen from his house. This was the only missing item recovered by the police.

Police investigating the breaking and entering discovered that, in addition to the kitchen door having been forced open, a reflector, originally located at the end of the driveway, had been knocked to the ground. Investigation did not reveal when the marker had been displaced. The reflector was found to contain minute smears of a white and greenish substance, which investigators assumed to be paint. Police removed the substance from the reflector, but never analyzed it.

Bruce Burkett testified that he had purchased Mr. Jackson's shotgun from a man named Sly, whom he described as a stocky black man. Burkett paid $75 for the gun and received a handwritten bill of sale from Sly. After he bought the gun, Burkett sold it to the Bel Air Gun Ex-

change. When detectives who had recovered the gun from the Exchange interviewed him about the gun, Burkett gave them the bill of sale.

Winfred Henderson testified that he was one of three men who committed the housebreaking. He claimed that appellant and a man known as Colonel Henry were his accomplices. Henderson said that the three of them were out riding in his sister's green and white van when they decided to commit a burglary. Breaking into the Jacksons' house through the side door, they stole, among other things, several guns. Henderson identified the shotgun as one of the guns which they had stolen from the Jacksons' house and had then sold to a man named Sly. Henderson, contrary to Burkett, described Sly as a white man. Henderson claimed that it was actually Colonel Henry who sold the gun to Sly, but that all three alleged accomplices were present at the sale.

Henderson, testifying as part of a plea agreement with the State, admitted that he would lie if it would help his situation, that it was not unusual for him to lie, and that he had lied to many people in the past. He also admitted telling the police he would tell them anything to save his own neck. Henderson did clarify that he had never lied to the police, and on redirect he stated that when he said he would tell the police anything they wanted to know, he meant anything he knew about the burglary. He further stated that he never told the police he would tell them anything they wanted to hear. Henderson also admitted that he and appellant had had many confrontations in the past over appellant's treatment of Henderson's sister with whom appellant had lived for several years.

Robert A. Faul, Maryland State Police, testified that he investigated the housebreaking. The details of Faul's testimony for the State appear later. For the defense, Trooper Faul testified that during his investigation he interviewed Mr. and Mrs. Jackson's neighbors to determine whether they had seen anything take place at the time of the

break-in. One neighbor told Faul that on the day of the crime, she drove past the Jacksons' house and observed a blue van parked in the driveway. She further observed two white males standing next to the van.

Appellant, a black man, testified that he did not remember exactly where he was on the day in question, but that he was either at work or at home. He denied any participation in the crime and stated that he could not identify the shotgun introduced by the State. He further denied ever being in possession of the gun or participating in the sale of the gun to Sly. Appellant testified that Henderson had lied about appellant's participation in the crime because of differences the two had experienced in the past concerning appellant's treatment of Henderson's sister. Appellant said that when he asked Henderson why he had lied about appellant's involvement in the theft, Henderson told him it was because he did not want to go to jail. Appellant also claimed that Henderson told him that he would say anything to avoid going to jail.

### Extrajudicial Statement of James Clyde Richard

In an evidentiary hearing during trial, the State sought to introduce the hearsay declaration of James Clyde Richard a/k/a "Sly." Sly, as the trial court aptly noted, is on the fly; he cannot be found. The substance of Sly's assertion was presented to the trial court in a proffer by the Assistant State's Attorney:

Basically, Your Honor, in a nutshell, the proffered testimony would be that when Trooper Faul, having traced down Sly through the fact that he had sold this gun to Mr. Burkett, when Trooper Faul interviewed Sly, Sly said he bought it from Colonel Henry; that when he bought it from Colonel Henry, Mr. Standifur, Mr. Henry and Mr. Henderson had driven up in a green and white VW van; that he paid Thirty Dollars to Mr. Henry for the purchase of this shotgun; and that at the time he did so, he suspected that it might be stolen. He suspected that it was probably stolen because it was common knowledge

that these guys were breaking and entering to support their habit.

Our examination of the record fleshes out the circumstances giving rise to Sly's statement. Having learned from Burkett that the shotgun identified as belonging to the victim had been purchased by Burkett from Sly, Faul and several other police officers went to Sly's apartment. When they arrived, Sly attempted to flee out the back doors but police stationed in the rear apprehended him and brought him back into the apartment. There he told Trooper Faul that he thought he was going to be arrested for drug involvement and that he was a heroin addict. Only after Faul told Sly that he was there to discuss a gun did Sly agree to talk. Sly then told Faul that he had purchased the gun from Colonel Henry (one of appellant's alleged accomplices) and that appellant had been present during the transaction. Later, Sly went with police to the station where he made a written statement to the effect that he had no knowledge that the gun was stolen.

As the evidentiary hearing continued, Trooper Faul took the stand. Faul testified that police efforts to locate Sly were unsuccessful. At no time was Trooper Faul asked by counsel or by the court about the substance of his conversation with Sly or about the circumstances surrounding the conversation. The content of Sly's assertion was before the trial court only as a result of the State's proffer (quoted above) of what Faul would relate. Nor was Faul asked about the circumstances surrounding the subsequent taking of Sly's conflicting written statement. The Assistant State's Attorney had, however, previously told the trial judge that "by that time [arrival at the station] I think Sly had realized that he had possibly implicated himself on [a] receiving stolen property charge, because by the time they got to the barracks his tune had changed to one of 'I bought it in good faith and I sold it in good faith.'" Over defense counsel's objection, the trial court ruled the hearsay testimony admissible as a declaration against Sly's penal interest—an admission of the possession of stolen goods.

### 1. *Preservation of Issue on Appeal*

We must initially resolve an important procedure issue: When an evidentiary ruling is made and objected to during the trial but at a hearing away from the jury, and the ruled upon evidence is then immediately presented to the jury without objection, is the issue presented there "tried and decided" by the lower court and thus preserved for our review within the meaning of Md.Rule 1085? [1]

During the State's case-in-chief, the Assistant State's Attorney, anticipating a defense objection to the hearsay testimony he was about to introduce, approached the bench, described the testimony, and suggested that the court might wish to hear arguments. The court then sent the jury to lunch and proceeded with a full evidentiary hearing. At the hearing's conclusion, the judge ruled the out-of-court statement admissible. Defense counsel then initiated the following exchange:

> [DEFENSE COUNSEL]: Your Honor, if I may, I just want to be—if the Court's going to make a decision, just note my objection and the reason.
>
> THE COURT: Go ahead.
>
> [DEFENSE COUNSEL]: I'm assuming—
>
> THE COURT: I'm going to permit it.
>
> [DEFENSE COUNSEL]: —the Court is going to permit the evidence. I would just again object, stating basically that I don't feel the State has met the criteria to allow this evidence in. And for that reason, I feel it should be excluded and not permissible.

Having clearly objected to the court's ruling on the hearsay question, defense counsel next requested that the hearsay testimony be limited to specific relevant statements. The court agreed to this separate request and the State's Attorney indicated that he understood the limitation. When

---

1. Md.Rule 1085 states in relevant part:

 This Court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court. . . .

the jury returned, Trooper Faul, who had also been questioned at the hearing, testified to the substance of the out-of-court statement as limited by the court and understood by counsel in the prior hearing. On appeal, the State argues that the objection made to the evidentiary ruling at the hearing was waived because it was not renewed when Trooper Faul actually took the stand.

█ Rule 1085 is the source of the requirement that for a question of admissibility of evidence to be preserved for appellate review, that testimony must generally have been objected to in the court below. *See Lapelosa v. State*, 44 Md.App. 202, 207, 407 A.2d 786, 789 (1979). The rationale for this requirement is that a timely objection brings the issue to the trial court's attention immediately, enabling it to hear arguments and rule on the issue, thus preventing the trying of cases in a piecemeal fashion. *See Clayman v. Prince George's County*, 266 Md. 409, 416, 292 A.2d 689, 693 (1972). In short, the timely objection requirement is imposed to ensure that this Court does not review an issue which has not been "tried and decided" below.

There is no doubt but that counsel in the instant case objected. The timing of the objection is at issue. The State analogizes the situation at bar to that of a grant or denial of a motion *in limine*, relying on *Funkhouser v. State*, 51 Md.App. 16, 440 A.2d 1114, *cert. denied*, 293 Md. 331 (1982). But there, this Court stated:

> [The grant or denial of a] motion *in limine is not a ruling on evidence.* It adds a procedural half step to the offer of evidence. It serves the useful purpose of raising and pointing out before trial, certain evidentiary rulings that the court may be called upon to make.

*Id.* at 24, 440 A.2d at 1119 (emphasis added).

In *Funkhouser*, at a pretrial hearing on a motion *in limine*, defense counsel objected to the grant of the State's motion to exclude certain evidence. On appeal, this Court found it important that defense counsel had made no proffer of just what the evidence would be, and further, that

"he made no attempt whatsoever to introduce the evidence *at trial by way of a proffer out of the hearing of the jury ....*" *Id.* at 24, 440 A.2d at 1119 (emphasis added). Because none of the evidence the defense had desired to introduce was presented to the trial court for a ruling, there was nothing to review on appeal. This Court concluded that the grant of the motion did not, in and of itself, preserve error. *Id.* at 24–25, 440 A.2d at 1119.

■ In the instant case there is neither a motion *in limine* nor is there any similar motion. There is a *ruling* on evidence. Unlike *Funkhouser,* we have a proffer, a full evidentiary hearing during trial, a firm ruling by the trial court, and a strenuous objection by defense counsel to that ruling. Nevertheless, appellee would have us require defense counsel to have immediately renewed his objection when the evidence was received by the jury because otherwise "one is left to guess what the trial court would have ruled in the face of a specific objection during Faul's testimony." This argument implies that the entire evidentiary hearing was for naught and that the trial court would have reversed its immediately preceding ruling on the very evidence it had just ruled admissible. We think this unlikely.

■ It is a long-standing rule in Maryland that any objection to the admission of evidence is waived by the subsequent admission, without objection, of the same evidence at a later point in the proceedings. *See, e.g., Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679, 682–83, 298 A.2d 442, 444 (1973). This, of course, must be so for otherwise it would become the trial court's burden to keep track of its previous rulings. It is also said that "cases are legion in the Court of Appeals to the effect that an objection must be made to each and every question, and that an objection prior to the time the questions are asked is insufficient to preserve the matter for appellate review." *Anderson v. State,* 61 Md.App. 436, 460, 487 A.2d 294, 306 (1985) (quoting *Sutton v. State,* 25 Md.App. 309, 316, 334 A.2d 126, 130 (1975)). While we

believe the aforementioned cases correctly state the law in Maryland, we think the rule inapplicable to the facts of the case before us.

The prosecution here anticipated and preempted the logical moment for an objection to the "question" (meaning here the actual interrogatory addressed to the witness) by approaching the bench to initiate argument on the issue. When the evidentiary hearing had concluded with the trial court's firm ruling against him, counsel objected strongly. To require another objection immediately would be pointless and would be tantamount to the reinstitution of the requirement that objecting counsel take formal exception to the overruling of their objections.

Here we have one transaction—a proffer of evidence, a ruling, and an objection after which the prosecutor posed his question. This is no different in substance from the scenario in which a question is asked, an objection is made, counsel approach and argue at the bench, the objection is overruled, and the same question is posed again to the witness. In that situation our review would certainly not be precluded by counsel's failure to renew his objection to the repeated question, so long as the grounds argued on appeal were the same as those "tried and decided" by the trial court.[2] Here we are only missing the initial objection which was precluded by the circumstances.

It is axiomatic that the law does not require the doing of a useless or futile thing, yet the State urges that we demand just that. We decline to do so. Here the actual testimony was introduced immediately after the trial court

---

**2.** *See Bratt v. State,* 62 Md.App. 535, 490 A.2d 728 (1985). A defense objection, made on hearsay grounds to the State's proffer of an out-of-court statement, was not renewed when the evidence was subsequently presented to the jury. On appeal, error was argued on grounds that the statement was prejudicial to the defendant. This Court held the issue was not preserved because appellant, having objected on specific grounds below (hearsay), waived all other non-specified grounds. *Von Lusch v. State,* 279 Md. 255, 368 A.2d 468 (1976). The Court did *not,* however, hold the issue not preserved because of failure to renew the objection.

ruled that it was admissible. The facts of this case do not present a situation where the trial court had a weekend, a day, or even an hour to reconsider his ruling. Had the facts of this case fallen within any of the latter hypothetical situations, we might well have been compelled to find that defense counsel's failure to renew the objection was grounds for nonpreservation. Although it may have been prudent for defense counsel to re-object, under the circumstances we are convinced that he complied with the spirit and substance of the rule.

## 2. *Admissibility of Hearsay*

The admission of hearsay evidence in a criminal trial raises not only common law evidentiary questions, but also certain constitutional considerations. When exculpatory hearsay testimony of an unavailable declarant is introduced by the defense, the fourteenth amendment compels its admission when persuasive guarantees of trustworthiness are found and when exclusion, on the facts of the case, would deprive the defendant of a fair trial. *See Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984). On the other hand, when the prosecution offers inculpatory hearsay, no such due process concerns exist on the part of the State. In this latter situation, the defense may invoke the confrontation clause of the sixth amendment as a basis for exclusion. In this regard, the Supreme Court of the United States has held that while the confrontation clause and the hearsay rules protect similar values, they are not completely congruent. *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). Evidence admitted under a recognized exception to the hearsay rule does not guarantee compliance with the constitutional standard. Conversely, confrontation clause values are not offended merely because evidence is received in violation of the common law rule. *Id.* at 156, 90 S.Ct. at 1934. Generally, the hearsay statement of an unavailable declarant is admissible against a criminal defendant only if

it bears adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Such reliability "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*

In Maryland no reported cases dealing with the declaration against penal interest exception to the hearsay rule involve the introduction of inculpatory hearsay by the State against a criminal defendant. In fact, in criminal cases, this particular exception has always been invoked to admit third party admissions offered to exculpate the defendant. While this is not a critical fact from an evidentiary point of view (*see Jacobs v. State*, 45 Md.App. 634, 651, n. 4, 415 A.2d 590, 600, n. 4, *cert. denied*, 288 Md. 737 (1980)), courts have noted the fact in their holdings (*see, e.g., Dyson v. State*, 238 Md. 398, 407, 209 A.2d 609, 614 (1965), *vacated on other grounds*, 383 U.S. 106, 86 S.Ct. 717, 15 L.Ed.2d 617 (1966)), and have stated a rule of admissibility with undeniable constitutional overtones:

> Since we feel that a declaration against one's penal interest, standing alone, has an inherent indicium of trustworthiness, ... it is our judgment that only in those cases where there is evidence that the out-of-court declaration is untrustworthy, frivolous or collusive should the jury be precluded from receiving and assessing the statement. To hold otherwise would serve to usurp the traditional role of the jury as the trier-of-fact and, concomitantly, deprive an accused of his right to due process under the law.

*Harris v. State*, 40 Md.App. 58, 65, 387 A.2d 1152, 1156 (1978) (citations and footnote omitted).

 The correct procedure then for determining the admissibility of hearsay testimony in a criminal trial is a two-step process. First, the statement must be analyzed from the common law evidentiary standpoint. The inquiry

ends where, based on proper application of evidentiary principles, the statement is excluded when offered by the State or is admitted when offered by the defense. If the statement is offered by the defense and is excludable based on these principles, the court also must examine the facts of the case in light of the fourteenth amendment considerations set out in *Chambers* and *Foster.* In the case where hearsay is offered by the State and found admissible under a well-recognized exception to the rule, the court must consider the possible sixth amendment confrontation clause ramifications, recognizing that it is the burden of the party challenging the ruling to overcome the presumption of trustworthiness and admissibility. *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539; *Dyson v. State,* 238 Md. at 407, 209 A.2d at 614.

In the instant case, the extrajudicial statement of Sly was unquestionably hearsay, *i.e.,* an out-of-court statement offered in court to prove the truth of matters asserted therein. *Mutyambizi v. State,* 33 Md.App. 55, 65, 363 A.2d 511, 518 (1976), *cert. denied,* 279 Md. 684 (1977). It was admitted at trial as a declaration against penal interest, an exception to the hearsay exclusionary rule which is well-established in Maryland. *See Jacobs v. State,* 45 Md.App. at 651, 415 A.2d at 600. As with any exception to the general rule of exclusion, a declaration against interest is admissible into evidence only if the indicia of reliability and trustworthiness which form the rationale for the exception—that a reasonable person will not say anything that he knows to be against his own self-interest unless he believes it to be true—are established.

In *Agnew v. State,* 51 Md.App. 614, 446 A.2d 425 (1982), this Court adopted a six-factor analysis for determining the reliability of a declaration against penal interest. Application of these factors forms the basis for the evidentiary analysis upon which our decision rests.

(1) *The declaration must have the potential of actually jeopardizing a penal interest.*

In order for Sly's penal interest to have been actually jeopardized, Sly must have known that the gun was stolen or must have believed that it probably had been stolen. Md.Code Ann. art. 27, § 342(c) (1982 Repl.Vol.). Although Trooper Faul was never questioned on the subject, we have the State's proffer of what Faul would have said that Sly said, to wit—that "he [Sly] suspected it might be stolen. He suspected that it was probably stolen because it was common knowledge that these guys [appellant and alleged accomplices] were breaking and entering to support their habit." The question is whether this statement had the potential of leading to Sly's criminal prosecution for possession of the gun.

Appellant argues that the "common knowledge" referred to could, at best, give rise to a mere suspicion that the gun might be stolen and further, that Sly, by giving a sales receipt which clearly identified him, acted in a manner inconsistent with knowledge that the gun was probably stolen. In fact, this is inconsistent only with the assumption that Sly could appreciate the consequences of possessing stolen goods. *See infra* factor 3. The problem here is that, without more, neither this Court nor the trial court knows what the long gone Sly thought. All we have is the State's proffer in which the prosecutor, in the same breath, states that Sly suspected the gun *might* be stolen and then that he suspected it was *probably* stolen. This double hearsay characterization of the declarant's frame of mind is at least equivocal and certainly demonstrative of the very reason for the hearsay rule. Assuming, for the moment, however, that the State sufficiently established that Sly's remarks were at least potentially disserving, we continue to the next factors.

(2) *The declaration must be against a penal interest at the time it is made.*

This factor is satisfied. If the declaration was against Sly's interest, it was against that interest when it was made

since Sly had already bought and sold the gun when the police questioned him.

### (3) *The declarant must perceive the disserving quality of the statement.*

This factor goes to the heart of the rationale for this hearsay rule exception: That a reasonable man will not knowingly make a self-incriminating statement unless it is true. If the declarant does not realize the disserving nature of his statement when it is made, his statement bespeaks merely ignorance, not trustworthiness. *See generally* D. Binder, *Hearsay Handbook,* § 29.03 at 381 (2d ed. 1975). Here Sly made two statements. The first, made at his apartment, was that he suspected the gun was probably stolen. In the second statement, written and signed at the station, Sly claimed good faith and a lack of knowledge that the gun was stolen. By way of explanation, the State argued to the trial court that by the time he reached the station, Sly "realized that he had possibly implicated himself...." The logical inference to be drawn then from the second statement is that, at the time the first statement was made, Sly did not appreciate its potentially inculpatory nature. In addition, we infer from the fact that Sly would not speak with police until he learned that they were not on a drug raid, that had Sly realized the potential for implicating himself in a theft offense he would have remained silent on this subject also.

### (4) *The disserving portion of the declaration must be related to its disserving character.*

Sly's statement can be separated into two parts: (1) he bought the gun from the defendant, and (2) he suspected it was probably stolen. Part (1), which is all that came in at trial, is clearly relevant. Part (2), the disserving portion, is irrelevant and was excluded from trial. This was proper because Sly's opinion as to whether and why he suspected that the gun was stolen, while relevant in a determination of Sly's culpability for theft, was completely irrelevant to the issue of appellant's guilt. We believe that in this case

the relevant portion was also by implication disserving. In the evidentiary hearing before the court, the State arguably established that Sly suspected that the gun was probably stolen. Given this foundation, the statement "I bought the gun from the defendant" was inculpatory in itself. It is not necessary that the jury know why or even that the statement is disserving so long as the trial judge has been so satisfied.

(5) *There must be no probable motive to falsify the declaration.*

On the facts of this case, there exists the possibility of a self-serving motive to falsify. Declarant Sly, a self-admitted drug addict, was apprehended while attempting to escape out the back door of his apartment when officers came to question him. He readily admitted his fear of a drug arrest and spoke to officers only after he learned that they were interested not in drugs but in information about the gun. In this apparent custodial situation, and with an admitted and genuine fear of a drug arrest, Sly, relieved that he might be spared that prosecution, may well have said whatever he thought the police wanted to hear. As the advisory committee on the Federal Rules of Evidence warned when writing about the declaration against penal interest exception:

Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.

*U.S. v. Palumbo,* 639 F.2d 123, 127 (3d Cir.1981) (quoting Fed.R.Evid. 804 advisory committee note). Indeed, there is authority for the proposition that "the fact of custody alone, with its attendant likelihood of motivation by a desire to curry favor with the authorities, bars a finding that the statement was against interest and requires exclusion." *McCormick on Evidence,* § 279 at 826 (3d ed. 1984). *See*

*also U.S. v. Palumbo,* 639 F.2d at 128; *U.S. v. Love,* 592 F.2d 1022, 1025 (8th Cir.1979).

Whether this possibility of a self-serving motive to falsify rises to the level of a *probable* motive is hard to say. Once again, the record reveals *nothing* about Sly, his background, or the seriousness of the feared drug charge. It is at least fair to say that a close question exists.

### (6) *The declarant must be acting as a reasonable person.*

If a reasonable person would not have made the statement in question, the fundamental rationale for the exception disappears. Courts have refused to admit the declaration of a chronic alcoholic who was under the influence when the declaration was made, *see U.S. v. Sheard,* 473 F.2d 139, 149 (D.C.Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973), and have also excluded the declaration of one who was under the influence of narcotics when he made the statement. *See State v. Gervais,* 317 A.2d 796 (Me.1974). Without more facts about the declarant Sly, it is impossible to assess the reasonableness of his state of mind at the time the statement was made. The record shows that he was a heroin addict fearful of an arrest when the declaration was made and this certainly raises a fundamental question regarding Sly's reasonableness.

In *Agnew,* this Court stated that the above six factors are to be applied separately and weighed cumulatively. 51 Md.App. at 628, 446 A.2d at 434. In this case the State carried its burden of proof only on factors one, two, and four, although factor one, an absolute predicate to admissibility, is questionable. As to factor three, which must be given significant weight, since it defines the very rationale of the exception, the facts and their logical inferences will not support the State's argument. For lack of relevant facts, factors five and six cannot be effectively considered. We find that, on balance, the State did not make its case for

admissibility and the hearsay testimony should have been excluded.

Had the out-of-court statement in question satisfied the common law evidentiary standard for admission which, as we have ruled, it did not, our review of this case would necessarily have entailed a further step. We would have been compelled to review the record to determine whether or not appellant rebutted the presumption of reliability by showing that the statement was so untrustworthy that its admission should have been denied from a constitutional standpoint. A cursory review of the record reveals that appellant may well have rebutted any inference of reliability. *See Roberts v. Ohio,* 448 U.S. at 66, 100 S.Ct. at 2539.

### 3. *Effect of Improper Admission*

The State's case rests principally on the testimony of alleged accomplice Henderson which, if uncorroborated, is insufficient to support the conviction. *Luery v. State,* 116 Md. 284, 81 A. 681 (1911). Assuming, without deciding, that sufficient corroboration exists to credit the testimony of accomplice Henderson, another consideration nevertheless concerns us.

■ Where hearsay testimony has been improperly admitted against a criminal defendant, and that hearsay may have been the "ingredient necessary to convince the jury" of the defendant's guilt, the error committed in admitting the hearsay is not harmless. *Jones v. State,* 17 Md.App. 209, 216, 300 A.2d 424, 427 (1973). *See also Howard v. State,* 4 Md.App. 74, 241 A.2d 192 (1968), in which this Court reversed a conviction because of the admission of hearsay testimony. There, a police officer was allowed to testify as to an out-of-court identification of the defendant made by the victim's wife who was not called as a witness. The victim also identified the defendant. In reversing the conviction, this Court held that despite the fact that identification by one eyewitness, if believed, is sufficient to sustain a conviction, it was impossible to say that the police officer's improperly admitted hearsay testimony did not have a

material bearing on the jury's determination of guilt. *Id.* at 77, 241 A.2d at 194. *See also Johnson v. State,* 23 Md.App. 131, 326 A.2d 38 (1974), *aff'd,* 275 Md. 291, 339 A.2d 289 (1974) (where trial is by a jury, all reasonable doubt as to effect of erroneously admitted evidence upon jury's determination of guilt must be resolved in favor of objecting party).

Even if we assume *arguendo* that evidence exists which was legally sufficient to corroborate the accomplice testimony, the jury heard the stronger, direct corroborative hearsay testimony of Sly. Because we think the testimony of the absent Sly was so obviously important, we cannot say that the jury would have convicted without it. For this reason we must reverse and remand for a new trial.

### *Jury Instructions*

Since following the trial court's instructions to the jury, defense counsel specifically stated that he had no objections or exceptions to those instructions, the issue of whether those instructions constituted error is not preserved for our review. Md.Rule 4–325(e), Rule 1085.

JUDGMENTS REVERSED.

CASE REMANDED FOR NEW TRIAL.

COSTS TO BE PAID BY CECIL COUNTY.