493 A.2d 396

**Julius Sylvester BAILEY**

v.

**STATE of Maryland.**

No. 1437, Sept. Term, 1984.

Court of Special Appeals of Maryland.

June 10, 1985.

596

598

Russell F. Canan, Assigned Public Defender, Washington, D.C. (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Arthur A. Marshall, Jr., State's Atty., and Robert H. Harvey, Jr., Asst. State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before GARRITY, GETTY and ROSALYN B. BELL, JJ.

GETTY, Judge.

On September 20, 1984, a jury sitting in the Circuit Court for Prince George's County (Melbourne, J.) convicted appellant Julius Sylvester Bailey (hereinafter "appellant") of first degree (felony) murder, kidnapping, robbery and relat-

ed offenses, rape in the first degree while armed, attempted rape in the first degree while armed, and use of a handgun in the commission of a crime of violence. Appellant was sentenced to life imprisonment plus 65 years. At sentencing, the court imposed two additional consecutive life sentences plus 270 years for unrelated crimes. Appellant urges that the trial court erred when it:

1. denied his Motion to Quash the Indictment and Challenge to the Composition of the Grand and Petit Juries;

2. limited the cross-examination of a State witness;

3. admitted "other crimes" evidence;

4. found the evidence sufficient to support his rape-related convictions;

5. prohibited the defense from introducing evidence regarding what tests could have been conducted had certain forensic evidence been preserved; and refused to give an adverse inference instruction regarding that "missing" evidence.

It was established at trial that on December 5, 1983, an employee of the Newbridge Country Club found the body of Ann Boggs, a student at Catholic University in the District of Columbia, lying on the edge of a golf course. Ms. Boggs' clothing was disarrayed and an autopsy established that she had died as the result of being shot twice in the head. Sperm was found in both her vagina and rectum. Robert Weldon, a law student, was the last person—other than the murderer—to see her alive. He testified that he saw her leave the law school at approximately 6:00 p.m. on Friday, December 2, 1983. He believed she was en route to her car, which she habitually parked in the Shrine parking lot, approximately 200 yards from the law school. The circumstantial case against appellant will be discussed in reviewing the issues he raises.

I

■ Appellant contends that his constitutional rights were violated because the voter registration list that was

used as the sole source for the names of his potential jurors failed to represent a fair cross section of the community. Under-representation in the jury pools of distinctive groups in the community may be challenged under either the equal protection clause of the Fourteenth Amendment, *see Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), or under the right to a jury selected from a fair cross section of the community guaranteed by the Sixth Amendment. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Although this right to a jury selected from a fair cross section is also guaranteed by Md.Cts. & Jud.Proc.Code ann. § 8–102, 8–104 (1984 Cum. Supp.), appellant's argument is based solely upon the Sixth Amendment.

We addressed the voter registration—fair cross section issue in *Wilkins v. State,* 16 Md.App. 587, 300 A.2d 411 (1973), in which we reasoned that

"[n]either the Constitution, nor the requirements of common sense, demand a scientifically perfect system for producing a representative cross section of the community. Nor has such a system been devised....

All that is required is a method reasonably designed to produce a jury representative of a cross section of the community. The objective selection of names at random from registration lists as provided by Art. 51 [of the Md. Code, now Cts. & Jud.Proc.Art., Title 8] fully satisfies this requirement and commends itself to an impartial jury system."

*Wilkins v. State,* 16 Md.App. 587, 596–97, 300 A.2d 411 (1973), *aff'd* 270 Md. 62, 310 A.2d 39 (1973); *cert. denied,* 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 889 (1974). *See also Lodowski v. State,* 302 Md. 691, 490 A.2d 1228 (1985) (reaffirming *Wilkins*).

Since our decision in *Wilkins,* however, the Supreme Court has outlined a more elaborate, three part test for the analysis of fair cross section claims brought under the Sixth Amendment. In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct.

664, 58 L.Ed.2d 579 (1979), the Supreme Court held that a jury selection process is *prima facie* violative of the Sixth Amendment upon proof that:

1) The groups alleged to be excluded are "distinctive" groups in the community;

2) the representation of these groups is not fair and reasonable in relation to the number of such persons in the community;

3) this underrepresentation is due to the "systematic exclusion" of these distinctive groups. *See Id.* at 364, 99 S.Ct. at 668.

■ With regard to the first criterion, appellant argues that both blacks and persons aged 18–29 are "distinctive groups." We are persuaded by the overwhelming weight of authority that age groups are not "distinctive" for purposes of fair cross section analysis. *See, e.g., Cox v. Montgomery,* 718 F.2d 1036, 1038 (11th Cir.1983); *United States v. Blair,* 493 F.Supp. 398, 406 (Md.1980).

In *Hopkins v. State,* 19 Md.App. 414, 311 A.2d 483 (1973) (Gilbert, C.J.), we said:

"In order for a group to be 'cognizable' it must be shown that the particular group has a definite composition and that membership does not shift from day to day. The group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process.' *United States v. Guzman, supra* [337 F.Supp. 140 (S.D.N.Y.1972)] at 143; *Wilkins v. State, supra* at 595. Moreover, the possibility must exist that the exclusion of the group from jury service will result in bias, partiality or prejudice being practiced against members of the group by juries hearing cases in which members of the group are involved. *United States v. Guzman, supra* at 143–146; *United States v. Greenberg,* 200 F.Supp. 382, 391 (S.D.N.Y.1961). The evidence in the instant case

fails to establish that the attitudes, experiences, views and objectives of persons in the eighteen to twenty-one years of age group differ to any material extent or degree from those twenty-one years of age or a few years older. Furthermore, the appellant did not demonstrate that the rights of persons eighteen to twenty-one years old were inadequately represented or safeguarded by persons who were at that time eligible to serve as jurors."

*Id.* at 421, 311 A.2d 483 (footnotes omitted). The reasoning in *Hopkins* is equally applicable to the facts of the case *sub judice.*

■ We hold, therefore, that no *prima facie* claim was made with regard to the alleged underrepresentation of persons aged 18–29. Blacks, on the other hand, are a distinctive group, and hence appellant's allegation that they are excluded by the Prince George's County jury selection system satisfies the first prong of the *Duren* test. *See Peters v. Kiff,* 407 U.S. 493, 498–99, 92 S.Ct. 2163, 2166–67, 33 L.Ed.2d 83 (1972).

Appellant then urges that the trial court erred in failing to find the expert testimony presented on his behalf sufficient to show that the representation of blacks in the jury pool was unfair and unreasonable in relation to the number of such persons in the community. The record shows that Dr. Richard A. Seltzer, an expert in statistical data analysis and survey research, testified that he examined one out of every 15 juror questionnaires filed in 1978–1983 and concluded that, although blacks constituted 34.7% of the population, they made up only 21.2%[1] of the jury pool for that

---

1. Dr. John McConahay, also an expert in statistical data analysis, conducted an independent survey of the Prince George's County jury selection system for the period 1977–1982. His results were markedly similar to the data compiled by Dr. Seltzer. Both experts concluded that the 20% refusal of potential jurors to identify themselves by race is insignificant, because extensive research indicates no difference in the refusal rates based on race.

four year period. The difference between these two percentages is an "absolute disparity" of –13.5%.

■ We affirm the lower court's ruling that, on the facts of this case, evidence of a –13.5% absolute disparity was insufficient to show an unfair and unreasonable underrepresentation of blacks in the Prince George's County jury pools.[2] Although there are no precise mathematical standards for determining what level of underrepresentation is constitutionally impermissible, the absolute disparity has approached 40% in every instance in which the Supreme Court has found a Sixth Amendment fair cross section violation. *See Duren, supra* (39.5%); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (43%); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (over 40%); *Casteneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (40.1%). Absolute disparities higher than that shown in the case *sub judice* have been held "fair and reasonable" in *Figueroa v. Puerto Rico,* 463 F.Supp. 1212, 1215 (D.Puerto Rico 1979) (17%); and in *Williams v. Dalsheim,* 480 F.Supp. 1049, 1055–56 (E.D.N.Y.1979) (21%).

■ Appellant also argues that the trial court erred in not finding the second prong of the *Duren* test satisfied by Seltzer's additional testimony that the underrepresentation of blacks in the Prince George's County jury pools reflects a "comparative disparity" of –38.9%. We find no error. We note that "[t]he fair cross section requirement involves a comparison of the ... sources from which jurors are drawn with the makeup of the community...." *Duren, supra,* 439 U.S. at 366 n. 23, 99 S.Ct. at 669 n. 23. "Absolute disparity" figures, calculated by subtracting the percentage of a group represented in the jury pool from the group's percentage in the community, are, in our view, the

---

**2.** Nevertheless, some counties might wish to study the feasibility of appellant's suggestion that the Bureau of Motor Vehicles drivers' license lists be merged with the voter registration lists so as to reduce this absolute disparity even further.

relevant statistics for purposes of fair cross section analysis.

Most federal cases agree, finding, albeit for conflicting reasons, that "comparative disparity" figures, which are calculated by dividing the absolute disparity number by the percentage of the cognizable class in the eligible population, distort the true picture. *Compare United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.1980) (no need to consider comparative analysis figures so long as the allegedly excluded group comprises *more than* 10% of the population) *with United States v. Haffen,* 726 F.2d 21, 24 (1st Cir.1984) (the *smaller* the allegedly excluded group, the less appropriate is comparative disparity analysis). *Compare United States v. Duran De Amesquita,* 582 F.Supp. 1326, 1330–31 (S.D.Fla.1984) (comparative analysis will be inappropriate if the group comprises *more than* 10% of the community population) *with United States v. Musto,* 540 F.Supp. 346, 355–56 (D.N.J.1982) (comparative analysis will be inappropriate when the group at issue comprises a very *small* proportion of the population).

Having found that appellant's proof does not satisfy the second prong of the *Duren* test, we do not reach the third, which requires that the underrepresentation be due to the "systematic exclusion" of a distinct group. We point out, however, that we would reject appellant's invitation to join those courts which allow fair cross section challengers to bootstrap their way past this criterion. *See LaRoche v. Perrin,* 718 F.2d 500, 503 (1st Cir.1983) (process, "however neutral on its face," systematically excludes a group if that group is consistently and substantially underrepresented in the jury pools); *People v. Harris,* 36 Cal.3d 36, 201 Cal. Reptr. 782, 679 P.2d 433 (1984) (high absolute disparity sufficient to show that random selection from racially neutral voter lists systematically excludes blacks).

■ The third prong of the *Duren* test is not mere surplusage. It is not, therefore, automatically satisfied whenever the second prong is satisfied. We think the

Supreme Court made it abundantly clear that proof that a distinctive group is unreasonably underrepresented in a jury pool *does not mean* that this underrepresentation is, *ipso facto,* due to the systematic exclusion of that group.

In sum, proof that only a small percentage of a group registers to vote could, in a proper case, demonstrate an underrepresentation in Maryland's jury pools sufficient to satisfy the second prong of the *Duren* analysis. By itself, however, such proof would not also satisfy the third prong's "systematic exclusion" requirement.

## II

 Appellant argues that his Sixth Amendment rights were also violated when the trial court granted the State's motion *in limine* to preclude him from cross-examining Titus Peterson regarding an alleged connection between the State's decision to nolle pros its charges against him and his willingness to testify against the appellant. Because, subsequent to the court's decision to grant the motion *in limine,* appellant failed to proffer his evidence for a ruling at trial, this issue is not preserved for our review. It is well established that the mere grant of a motion *in limine* cannot constitute reversible error. *Funkhouser v. State,* 51 Md.App. 16, 24, 440 A.2d 1114 (1982).

## III

 Appellant argues that the trial court erred in denying his motion *in limine* to prevent Jan Adams from testifying that when she was kidnapped by appellant (one week after the murder of Ms. Boggs), appellant pointed a gun at her and said that he was not afraid to use the weapon, having already used it to shoot or kill someone a few days ago. At the hearing on this motion *in limine,* appellant invoked the rule against "other crimes" evidence while the State invoked the "identity exception" to the general rule. Because appellant failed to object to Adams' testimony after his motion *in limine* was denied, this issue

also is not preserved for our review. The denial of a motion *in limine* cannot constitute reversible error any more than the grant of that motion can. *Offutt v. State*, 44 Md.App. 670, 410 A.2d 611 (1980).

## IV

Appellant, conceding the sufficiency of the evidence that he murdered Ms. Boggs, argues only that the evidence was insufficient to support the jury's verdict that he also raped her. Our standard for reviewing the sufficiency of the evidence is:

"Whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ).

 First degree rape is established upon proof that the defendant engaged in "vaginal intercourse with another person by force or threat of force against the will and without the consent of the other person" and that he employed or displayed "a dangerous or deadly weapon." Md.Ann.Code Art. 27, § 462(a) (1982 Repl.Vol.). We hold that a rational trier of fact could find, from the presence of sperm, that vaginal intercourse had taken place. We further hold that a rational trier of fact could find, from the fact of the killing, that this intercourse was accomplished by force or threat of force pursuant to the use or display of the murder weapon.

## V

 Appellant contends for the first time on appeal that the State's alleged mishandling of the pubic hairs and semen slides it took from the victim's body denied him the due process of law guaranteed by the Fourteenth Amendment. Because this constitutional question was not tried

and decided in the trial court, it is not properly before us. Md.Rule 1085. *See also Smith v. State*, 16 Md.App. 317, 324, 295 A.2d 802 (1972) and cases cited therein.

He also argues that the trial court erred in disallowing evidence as to the probative value of the tests that could have been conducted on the semen slides and combed pubic hairs if that evidence had been preserved.

The record shows that on direct examination, John Quill, an FBI hair and fiber expert, testified that he identified a body hair found in the passenger seat of Ms. Boggs' car as being of Negroid origin, but that he was unable to determine the age or sex of the person who lost that hair. On cross-examination, the court sustained the State's objection to the following question posed by appellant: "Is it a standard investigatory technique in your office to examine the combed pubic hairs of an alleged rape victim?" Appellant proffered that if Agent Quill were allowed to respond, he would answer in the affirmative.

Appellant also sought to call Dr. Nicholas Lappas, a forensic serology expert, to testify that the Medical Examiner's Office failed to follow proper procedures when it stained the only set of semen slides it produced, contaminating them for blood grouping purposes. The court granted the State's motion *in limine* to prohibit Dr. Lappas from testifying. Appellant proffered that, had Dr. Lappas been allowed to take the stand, he would have testified that the Medical Examiner's Office should have produced an additional, uncontaminated set of slides for a blood grouping analysis that could have inculpated or excluded appellant to within a .5% margin of error.

Before us, the State urges that both rulings were correct on the ground that evidence of the State's failure to follow its standard forensic procedures was simply irrelevant to the case.

We disagree. In *Eley v. State*, 288 Md. 548, 419 A.2d 384 (1980), the Court of Appeals held that it was reversible error to prevent defense counsel from commenting on the

State's failure to produce fingerprint evidence. The Court reasoned that:

"... where a better method of identification may be available and the State offers no explanation whatsoever for its failure to come forward with such evidence, it is not unreasonable to allow the defendant to call attention to its failure to do so."

*Id.* at 554, 419 A.2d 384. In support of this holding, the Court cited *Jacobson v. State,* 551 P.2d 935 (Alaska 1976), in which a defendant was held entitled to argue that since he had established that it was normal procedure in that jurisdiction to make a videotape recording of those charged with drunk driving, the State's failure to videotape him permitted an inference that a tape, had it been made, would have been unfavorable to the State. Chief Judge Murphy then dissented on the grounds that, whereas the defendant in *Jacobson* had established a foundation for this negative inference by cross-examining the arresting officer and eliciting his testimony that the State failed to follow its standard procedure, the defendant in *Eley* never established "that fingerprint tests could have been made, should have been made, or were made...." *Eley, supra,* 288 Md. at 557, 419 A.2d 384.

Thus, we think both the dissent and majority opinion in Eley presupposed that defendants may establish that better evidence would have been available had the State followed its normal procedures. In our view, *Eley* is in accord with the general rule that

"[w]here it is apparent that a party has the power to produce evidence of a more explicit, direct, and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have laid open deficiencies in, and objections to, his case which the more obscure and uncertain evidence did not disclose."

31A CJS *Evidence,* § 156(1) (1964). *See also, Interstate Circuit v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) ("the production of weak evidence

when strong is available can lead only to the conclusion that the strong would have been adverse").

In the alternative, the State urges that its objections to the appellant's attempts to lay a foundation for a negative inference regarding the missing evidence were properly sustained because there was no suggestion that it deliberately suppressed the evidence, and because the evidence was equally unavailable to both sides at trial. This argument also must fail in light of *Eley, supra,* in which the defendant was entitled to lay a foundation for, and to argue, a negative inference despite the fact that the State was not alleged to have deliberately suppressed the fingerprint evidence and despite the fact that this evidence was equally unavailable to both sides at trial. Thus, the trial court's rulings regarding both the cross-examination of Agent Quill and the attempted examination of Dr. Lappas cannot be sustained on the basis that questions regarding the State's failure to follow its standard forensic procedures were irrelevant.

We hold, however, that because the appellant was permitted to elicit this same evidence from other witnesses, any error in limiting the examinations was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976).

We find that the exclusion of Agent Quill's testimony regarding the routine nature of hair analysis in rape cases was harmless because that evidence was merely cumulative to that elicited from Detective Hatfield, the chief investigating officer in this case. Hatfield testified that pubic hair samples were taken from both the victim and the defendant and that, if standard procedures had been followed, these known samples would have been sent to the FBI for a comparison analysis. Hatfield further testified that these procedures were not followed in the case *sub judice.* We also find that appellant was allowed to establish the probative nature of hair analysis because Agent Quill was permitted to testify that the science of hair

analysis is so exact that he could distinguish between the hairs of identical twins.

■ We find that the erroneous exclusion of Dr. Lappas' testimony regarding the routine nature of blood grouping analysis and its probative nature was harmless because his testimony would have been cumulative to that offered by Richard Reem, an FBI agent. Agent Reem was qualified as an expert in forensic serology. He testified for appellant that he routinely performed such analyses in rape cases and that, if the semen taken from the victim were inconsistent with the appellant's blood type, a routine analysis could have excluded appellant as a rape suspect. He further testified that because the State Medical Examiner's Office contaminated the only set of semen slides it produced, he was unable to perform this routine analysis.

Next, appellant urges that the trial court erred in refusing to instruct the jury that it could make an adverse inference from the State's failure to preserve and analyze the hair and semen samples.

■ We have already observed that appellant was entitled to lay a foundation for this negative inference at trial and to argue it to the jury during his closing remarks, and the record shows that he exercised both of these rights. We find no error in the trial court's refusal to embody that permissible inference in a formal instruction. Although we do not go so far as to say that the trial court could not have issued such an instruction, we do hold that it was not required to do so.

■ No Maryland court has ever held that a party is "entitled" to a missing evidence instruction, perhaps because, as we have noted in regard to "missing witness" instructions,

"The failure to grant an affirmative instruction does not remove the availability of the inference. As a consequence, whatever prejudice may usually come from not giving an advisory instruction is diminished, because the

inferential thought process is still available. The prejudice is simply that such an inference is not given preferred instructional attention over any other inferences available from the testimony or absence of testimony. Possibly for that reason, judges hesitate to grant the missing witness instruction; they do not wish to emphasize one legitimate inference over all others which the jurors have been told are solely within their judgment." *Yuen v. State,* 43 Md.App. 109, 114, 403 A.2d 819 (1979). Moreover, as McCormick has noted:

"... a practice which gives a party a right to such instruction is undesirable. If made a matter of right it is hard to escape the development of elaborate rules of law defining the circumstances when the right exists. To make it a matter of right has the advantage, it is true, of focusing past experience on the problem presented at the trial, but the cost here of complex rules far outweighs the gain." *McCormick on Evidence,* § 272 (2d Ed.1972). We think the propriety of issuing a "missing evidence" instruction is best left to the sound discretion of the trial judge.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.