680 A.2d 532

**Travis PEPPER, a minor, etc., et al.**

v.

**The JOHNS HOPKINS HOSPITAL.**

**No. 1241, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 31, 1996.

Reconsideration Denied Aug. 29, 1996.

Certiorari Granted Dec. 23, 1996.

50

54

C. Holly Buckley (Joanne L. Suder and Suder & Suder, P.A., on the brief), Baltimore, for Appellants.

Howard A. Janet, Baltimore, for Appellant, Travis Pepper.

Howard A. Janet, Wayne M. Willoughby and Janet & Strausberg, Baltimore, for amicus curiae, Maryland Trial Lawyers' Association.

Joseph G. Finnerty, Jr. (William L. Reynolds, Tracey Gann Turner and Piper & Marbury L.L.P., on the brief), Baltimore (of counsel: Richard P. Kidwell, Baltimore, on the brief), for Appellee.

Argued before WILNER, C.J., and BLOOM and SALMON, JJ.

SALMON, Judge.

Travis Pepper ("Travis"), a minor, and his parents, Linda and Terry Pepper ("the Peppers"), individually and as next friends of Travis, filed a complaint in the Circuit Court for Baltimore City on March 24, 1993 alleging that appellee, Johns Hopkins Hospital (Hopkins), was negligent in its care and treatment of Travis in 1987. At the request of Hopkins, the trial court granted a motion *in limine* that had the effect of precluding the introduction of any evidence of medical expenses incurred by Travis as a result of Hopkins's claimed negligence. After a two-week trial, the jury found that Hopkins had been negligent.[1] The jury awarded Travis $750,000 for non-economic damages, which was reduced to $350,000 pursuant to the statutory cap.[2] The jury did not award future

---

1. Hopkins vigorously contested liability at trial. There is no need, however, to set forth the factual predicate for the finding of negligence because Hopkins has not appealed that finding.

2. Md.Code (1974, 1995 Repl.Vol.), § 11–108(b)(1) of the Courts and Judicial Proceedings Article ("In any action for damages for personal

lost earnings because it determined that Travis would not "live to an age at which a person could ordinarily become gainfully employed." Linda and Terry Pepper, as parents and next friends of Travis, filed this timely appeal and ask the following questions,[3] which we have rephrased for clarity:

I. Did the trial court err by granting appellee's motion *in limine?*

II. Did the trial court err by precluding appellants' expert from testifying as to Travis's life expectancy while allowing appellee's expert to testify?

We answer the first question in the affirmative and the second in the negative, and we remand this case for a new trial on the issue of Travis's medical expenses only.

## FACTS

Travis was born on January 6, 1987 with severe heart and circulatory problems. He had a narrowing of the opening between the pulmonary artery and the right ventricle, which resulted in decreased levels of blood flowing into his lungs. He also had a hole in the wall of his heart between the left and right ventricles. In medical parlance, Travis suffered from tetralogy of Fallot with pulmonary atresia. Travis's doctors at Hopkins suggested two stages of surgery to correct these problems. First, he would undergo right ventricular out-flow tract reconstruction to increase the flow of blood from his

---

injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000").

3. Appellants also argue that

the trial court's rulings leave the Peppers with no choice but to disinherit their son, leaving him to become a ward of the State so that he can at least get the therapy, equipment and other services he needs and that are not currently being provided to him. This action, however, ultimately has the effect of improperly shifting the burden of providing for Travis Pepper's necessaries to the taxpayer.... Accordingly, as a matter of public policy the Court should not permit Hopkins to escape its responsibilities for Travis's injuries by shifting those responsibilities to the Maryland taxpayer.

We need not reach this policy argument.

heart through his pulmonary artery. A second surgery would repair the hole in his heart.

Travis underwent the right ventricular out-flow tract reconstruction at Hopkins on April 15, 1987. He developed post-operative complications resulting in severe neurological impairment. He has not undergone the second surgery.

The Peppers filed a six-count complaint against Johns Hopkins on March 23, 1993, almost six years after the surgery. Count I was a negligence action, brought by Travis, "by and through his Parents," which alleged that Hopkins was negligent in performing the surgery on Travis at such a young age and in failing to recognize and treat his post-surgery complications. Count I included the following allegations:

> As a direct and proximate result of the negligence of Defendant Hospital, *Travis suffered and will continue to suffer permanent and severe damages to his body and nervous system,* including but not limited to, severe lack of vision, seizures, severe cerebral palsy, anoxic encephalopathy, spastic quadriparesis, brain damage, severe mental and motor retardation, spasticity, loss of mobility, and other related disabilities, *which have in the past necessitated and will in the future necessitate expenses for: physical therapy and testing, frequent medical evaluation and care, medical treatment, special functional instruction and personal attendance and care.* As a direct and proximate result of the negligence of the defendants [sic] ..., Travis will, upon attaining maturity, suffer loss of earnings and impairment of earning capacity and other pecuniary and/or economic damages. Further ... Travis has suffered and will in the future suffer the loss of ability to lead a normal life, pain, suffering, mental anguish, embarrassment, humiliation and disfigurement, all of which is permanent, and other injuries and damages.
>
> . . . .
>
> WHEREFORE, Plaintiff, Travis Pepper, by and through his Parents, Guardians, and Next Friends, Terry and Linda Pepper, bring this action against the Defendants and claim

compensatory damages ..., costs and such other and further relief as the Court may deem necessary and proper.

Counts II and III were negligence causes of action brought by Linda and Terry Pepper, respectively, for Travis's medical expenses; counts IV and V alleged lack of informed consent by Travis and the Peppers, respectively. The final count, also captioned count V, alleged loss of consortium by the Peppers.

Hopkins filed a motion for partial summary judgment on June 2, 1993, alleging that the Peppers' claims were time-barred. The trial court granted the motion as to counts II, III, and both counts V (lack of informed consent and loss of consortium). Thus, only Travis's claims for negligence and lack of informed consent were left after the grant of partial summary judgment.

Appellants filed an amended complaint on June 13, 1994. The amended complaint included an allegation, appended to Travis's claim for negligence, that "Travis' parents, Terry and Linda Pepper, are financially unable to provide for the past and future care and treatment Travis will require and need as a direct and proximate result of the negligence of the Defendant, its agents, servants and/or employees." Hopkins filed a motion to strike, arguing that the amended complaint "was filed much too late and well after the time set by this Court for providing notice of any intent to amend. Discovery is closed and there is no time in which to start over." [4] The trial judge granted the motion to strike on June 23, 1994.

On the first day of trial, July 11, 1994, Hopkins's counsel orally made a motion *in limine* requesting that "no evidence of medical expenses ... go the jury because they are irrelevant to any recovery." Hopkins argued that a cause of action for recovery of any medical expenses already incurred and those expected to be incurred in the future belonged to the Peppers and, therefore, evidence of medical expenses was irrelevant to Travis's causes of action, the only ones left at

---

4. The trial judge cut off discovery on December 2, 1993. Appellants submitted their pretrial memorandum on March 9, 1994, which stated that they would require no amendments to the pleadings.

trial. Appellants countered by asserting that Travis had a cause of action to recover his medical expenses, comprising 90 percent of the damages alleged in the suit, and that the evidence as to those expenses should be considered by the jury. The trial judge granted the motion *in limine* the following day.

The case proceeded to trial on the issues of liability and damages, which were limited to Travis's lost future income and non-economic damages.

## DISCUSSION

### I.

Appellants are not appealing the trial court's grant of the motion to strike the amended complaint.

 Appellants frame the first issue presented as whether the trial judge erred in granting Hopkins's motion *in limine.* Once a party has made a motion *in limine* requesting that certain evidence be kept from the jury, the appropriate response by the opposing party is a proffer of the evidence that it seeks to introduce. *Lewis v. State,* 71 Md.App. 402, 414, 526 A.2d 66 (1987); *Standifur v. State,* 64 Md.App. 570, 578-79, 497 A.2d 1164 (1985), *aff'd,* 310 Md. 3, 526 A.2d 955 (1987). We find that appellants responded to the motion with a legally adequate proffer. Thus the issue was appropriately preserved for review, and Hopkins does not contend otherwise.[5]

---

5. It was said in *Funkhouser v. State,* 51 Md.App. 16, 440 A.2d 1114 (1982), that the "grant of a motion *in limine* cannot in and of itself constitute reversible error." *Id.* at 24, 440 A.2d 1114. This statement of the rule in *Funkhouser* was too broad. Logic dictates that that proposition cannot be true where there has been a proper proffer, because if it were, the loser of the motion would be left without recourse. Six years after our *Funkhouser* opinion, the Court of Appeals said in *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988),

Obviously, the trial judge may either grant or deny the motion. If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review. However,

## A. *Pre-Majority Expenses*

■ It is well settled that when a minor is negligently injured two separate causes of action arise: the minor child has one for the injuries he or she suffered, and the parent of the minor child has one for medical expenses incurred by the parent for treatment of his or her child's injuries. *Garay v. Overholtzer*, 332 Md. 339, 346, 631 A.2d 429 (1993). Generally, the minor child does not have a cause of action for his medical expenses because the "parents possess the exclusive right to recover a minor's pre-majority medical expenses." *Id.* at 367, 631 A.2d 429.

Hopkins argued in support of its motion *in limine* that medical expenses could not be recovered by Travis

> because he is not liable [for such expenses] and he never will be liable. You have to be liable to recover it as an element of damages.
>
> ... The only claim we have here [after the partial summary judgment] is by this child, and the law says this child is not entitled to recover medical expenses because he is not now and never will be liable for them, period.

■ The law in Maryland is that there are four exceptions under which a minor may have a cause of action to recover his medical expenses:

---

> when the trial judge resolves these motions by clearly determining that the questionable evidence will *not* be admitted, and by instructing counsel not to proffer the evidence again during trial, the proponent of the evidence is left with nothing to do at trial but follow the court's instructions. Under these circumstances, the court's ruling controls the subsequent course of the trial and the proponent's objection is preserved for review without any further action on his part.
>
> In *Funkhouser*, this Court put great weight on the fact that no proffer had been made to the trial court. We stated that Funkhouser "made no proffer of the evidence he sought to introduce except [for a] vague comment.... More important, he made no attempt whatsoever to introduce the evidence at the trial by way of proffer out of the hearing of the jury, or otherwise." *Funkhouser, supra,* 51 Md.App. at 24, 440 A.2d 1114. In contrast, appellants here made an extensive proffer.

(1) when the minor child has paid or agreed to pay the expenses, (2) when the minor child is legally responsible for payment, such as by reason of emancipation, or the death or incompetency of his parents, (3) when the parents have waived or assigned their right of recovery in favor of the minor child, or (4) when recovery of expenses is permitted by statute.

*Id.* at 366, 631 A.2d 429 (footnote omitted). The first, second and fourth exceptions noted above give a minor child a separate and distinct claim for his medical expenses. *Id.* at 366–67, 631 A.2d 429.

■ Generally, contractual obligations of minors are voidable. *McBriety v. Spear,* 191 Md. 221, 60 A.2d 528 (1948). Under the doctrine of necessaries, however, a minor is liable for the value of necessaries furnished to him or her, and a minor's contract is not voidable. *Monumental Bldg. Ass'n v. Herman,* 33 Md. 128 (1870).

■ In Maryland, parents have a statutory duty to support and care for their children. Md.Code (1984, 1991 Repl. Vol.), § 5–203(b) of the Family Law Article ("FL").[6] This statutory duty partially abrogates the doctrine of necessaries, making parents liable for the value of necessaries provided to their minor children. *See Garay, supra,* 332 Md. at 369, 631 A.2d 429. Medical care is embraced within the scope of this statutory duty of parents to support their minor children. *See, e.g., Kennedy v. Kennedy,* 55 Md.App. 299, 462 A.2d 1208 (1983). Nevertheless, the Court of Appeals stated in *Garay* that

the doctrine of necessaries is sufficient to hold a minor child liable for medical expenses incurred by him or her if it can be shown that his or her parent is unwilling or truly unable to pay them. This liability will, in turn, give a minor the right to claim medical expenses on his or her own behalf. It

---

**6.** Section 5–203(b) reads: *"Powers and duties of parents.*—The parents of a minor child: (1) are jointly and severally responsible for the child's support, care, nurture, welfare, and education. . . . *"*

would be manifestly unjust to hold a child liable for medical expenses but to deny that child the opportunity to recover those expenses from a wrongdoer.

332 Md. at 371, 631 A.2d 429. "[I]f it can be shown that the minor's estate has paid or is responsible to pay for any pre-majority medical expenses, this claim is also vested in the minor." *Id.* at 374, 631 A.2d 429. Thus, if the minor child meets his burden of showing that his parents are unable or unwilling to pay his medical expenses, and that he has paid or will be responsible for paying such expenses, he may make a claim for them. Appellants argue that the Peppers are unable and unwilling to pay for Travis's care. Therefore, Travis may become personally liable for these expenses, giving him a cause of action under the second *Garay* exception.[7]

The trial judge granted appellee's motion *in limine* because she found that the Peppers had not met their burden of showing they were unable or unwilling to pay for Travis's future medical expenses.

Appellants filed a written "Opposition to Defendant's Motion in Limine Re: Medical Expenses" on July 12, 1994, and a "Supplemental Memorandum in Support" on July 13, 1994.

---

**7.** Appellants also allege that the Peppers' insurance policy may make Travis personally liable for his medical expenses because it includes a subrogation provision allowing the company to seek reimbursement from any settlement or award Travis may recover for any medical expenses or services it has supplied to him. Appellants argue that this provision in the policy is analogous to a hospital lien under Maryland Code (1974, 1990 Repl.Vol.), § 16–601 of the Commercial Law Article (creating a lien in favor of a hospital on "50 percent of the recovery or sum which the patient ... collect[s] in judgment, settlement or compromise of the patient's claim against another for damages on account of the injuries"). "[T]hus the same policy considerations dictate the same conclusion as that reached in *Garay*," *i.e.,* that Travis should be able to recover his medical expenses because his insurance policy creates a "lien" in favor of the insurance company for money collected from another. Appellants argue that, by analogy, the insurance policy falls within the fourth *Garay* exception, which allows a minor to sue for his medical expenses "when recovery of expenses is permitted by statute." *Garay, supra,* 332 Md. at 371, 631 A.2d 429.

Appellants cited no statute giving the insurance company a lien on any recovery Travis might receive; the analogy is therefore inapt.

On July 19, 1994, before they rested their case, appellants made still another proffer. Appellants attached to the July 13 memo excerpts of deposition testimony by Dr. Malak Derakshani and economist Manuel R. Smith; affidavits from Mr. Smith and the Peppers; the Peppers' tax return; and their insurance policy. We look at the information in the July 13 memo and July 19 proffer in deciding whether the Peppers made a legally adequate proffer because the trial judge repeatedly told the Peppers that she would consider additional material as submitted by the Peppers. The trial judge said, "If you can . . . put together something more compelling than what I have already heard and seen, I will gladly take a look at that."

Appellants did proffer evidence to the trial judge that they were unable to pay for Travis's future medical care. According to the July 13th proffer, Linda Pepper no longer works outside the home because she must be home to care for Travis; Terry Pepper earns $20,795 a year working at his own business as an automobile mechanic; after paying taxes, the Peppers have a net monthly income of $1,537.75, which is well short of their monthly expenses of $2,289.

The Peppers do not have an individual savings account. They hold in their names, as parents of their older son, Tyler, age 10, a savings account worth about $18,000, which is designated as his college fund. They have an account in Travis's name containing about $1,700, comprised of gifts given to him. Mr. and Mrs. Pepper each hold about $9,000 in individual retirement accounts, which represent the only retirement funds they have available.

According to the materials set forth in the proffer, Mr. Pepper's income and the combined savings of the Peppers are insufficient to pay for all of Travis's future medical needs. The child has limited vision, severe cerebral palsy, partial motor paralysis of all four limbs, brain damage, severe mental and motor retardation, and spasticity. He cannot stand or sit up without assistance. In fact, he requires assistance with all of his activities of daily living. Appellants proffered that

Travis needs a wide range of medical, rehabilitative, and therapeutic services, which, as of the date of trial, he was not receiving. Appellants proffered deposition testimony of Dr. Derakshani, who opined that Travis needed a van with a lift, a wheelchair and other devices to assist him in standing and sitting, an electric bed, frequent physical therapy, and home modifications. Dr. Derakshani also testified that Travis needed daily medication and yearly muscle surgery. Raphael Minsky, a special rehabilitative psychologist, affirmed by affidavit that Travis needs physical therapy three times a day; occupational and speech therapy once a week; and vision services once a month. He also needs lifting and positioning devices, such as a prone stander, bath chair, wheelchair, and electric hospital bed, because his mother has difficulty lifting and moving him. According to Dr. Minsky, the Peppers' home needs to be modified to accommodate a disabled person.

Appellants further proffered that Travis was not receiving necessary medical services and equipment. He was not receiving physical, speech, occupational, hydro, or vision therapies because the Peppers could not afford those services. The Peppers did not have much of the equipment they needed for Travis, including a wheelchair, electric bed, shower chair, and a prone stander.

The Peppers also proffered deposition testimony and an affidavit of an expert economist, Mr. Smith, who opined that the total present value of "Travis's medical, home attendant care, transportation, therapeutic, and equipment and supplies needs" for the remainder of his life was in excess of $7,600,-000. Most of these expenses, which average about $117,000 a year, are not covered by the Peppers' insurance policy. For example, the Peppers' insurance does not cover home nursing, ambulatory apparatuses, home modifications, durable medical equipment for home use, long-term (*i.e.*, lasting more than sixty days) physical, speech or occupational therapies, and

vision training.[8]

The Peppers proffered that they were unwilling to provide for Travis if it meant either selling their home [9] to pay for his medical expenses or tapping into their retirement accounts and Tyler's college fund.

On July 19, 1994, at trial but outside the hearing of the jury, the Peppers proffered that they would have testified

as to their income and financial inability and/or unwillingness to afford and/or provide Travis with the necessities his physician said he will need to survive. They also would have testified that the insurance policy that they had with the Delmarva does not provide for any of the services Travis requires such as physical therapy, hydrotherapy, occupational, speech, vision therapy, home health aid and, after he reaches—becomes an adult, the educational services that would go on. It does not cover durable medicals, does not cover but a small amount of prescriptions and office visits. I think it's all but $10.00 at this time. And does not cover the—over 95% of all of the items that his—Dr. Derakshani and Dr. Minsky indicated would—would have indicated, to a reasonable degree of medical certainty, were necessary for this patient.

. . . .

Emmanual Smith is an economist and if permitted to testify, he would have testified to a reasonable degree of economic probability that the education, medical care and other related expenses related to Travis Pepper, [as stated by Dr. Derakshani and Dr. Minsky,] would have exceeded $7.4 million, all of which would have been deemed necessary for this patient, which the Peppers could not afford.

---

8. We cannot say precisely what portion of the $117,000 will be covered by insurance, but it is obvious that a large portion will not be.

 The policy does cover office visits with a primary care physician, office visits with a specialist, short-term rehabilitation service (*i.e.*, under 60 days), hospital stays, and surgeries.

9. The Peppers own the house in which the family lives. We cannot determine from the record how much equity they have in it.

We hold that the Peppers made a sufficient proffer that they were unable and/or unwilling to pay for Travis's future medical expenses. Hopkins's proffer was not as substantial. Counsel for Hopkins stated that "somewhere in here [Mrs. Pepper's deposition] she essentially said that with the exception of $10 deductibles and $20 deductibles here and there, that essentially all of the bills to date had been covered by insurance." Later, appellee argued, "Because the Peppers told us in discovery that they could afford Travis' needs and had good insurance to pay for it, we did not push further discovery on that point." [10] Finally, the following exchange must be noted:

THE COURT: How are the durable medical costs being paid at this time?

[COUNSEL FOR APPELLANTS]: They are paying it out of pocket.

[COUNSEL FOR APPELLEE]: That is the point, Your Honor.

The trial judge, in ruling on the motion *in limine,* stated: The question is whether or not this case falls within the necessaries exception [of *Garay v. Overholtzer,* 332 Md. 339, 631 A.2d 429 (1993) ] in which the parents would have to be unable or unwilling to pay. There certainly is no indication of any unwillingness to pay. The question is whether or not the minor child can show—and that is the way the case reads—that the parents are unable to pay.

---

**10.** Hopkins argued that it has never had the opportunity to have an accountant review Mr. Pepper's business records and that it would have served a detailed request for the production of documents had it known the Peppers' financial status was an issue.

Hopkins did conduct discovery on the Peppers' financial state even after Mr. and Mrs. Pepper's claims were dismissed at summary judgment on August 2, 1993. Hopkins deposed Mr. Smith, appellants' economist, in December 1993, four months after the Peppers' claims became a non-issue in the case. Hopkins deposed Dr. Derakshani, questioning him on what Travis needed medically. Hopkins also deposed Mr. Minsky and received his report detailing Travis's medical necessaries. Hopkins had a copy of the Peppers' tax return.

Hopkins's claim of ignorance and surprise is without merit.

*. . . . [I]n fact [his] expenses are being paid in some part. The durable medicals are being paid out of pocket,* apparently, I do not doubt at some great strain. . . .

*. . .* [O]ther expenses are being covered by virtue of whatever the insurance is that the parents provide. *And . . .* there is a fund for [sic] which there are resources available, apparently. So I cannot find from what I have heard to this point that there is [a] showing that these folks are within the category of indigent persons.

This is a family, at least the father of which, I am told, has his own business that is a running, going operation. So absent some further, more compelling evidence to show me that they are within the class of persons who would be characterized as unable to pay, then the Defendant's Motion *in limine* with respect to medical expenses is granted.

(Emphasis added.)

The Peppers' insurance policy provides bare bones coverage for the expenses Travis is already incurring and does not cover at all treatment that his doctor says he needs but is not receiving. The Peppers may be paying for the medical treatment Travis currently receives; however, based on the proffer, a jury could find that he is not getting the medical care that he needs. A jury issue was presented by the evidence set forth in the Peppers' proffer. We find that the trial judge erred in granting the motion *in limine.*

### B. *The Complaint*

 Appellee impliedly argues that Count I was insufficient to state a claim upon which relief could be granted insofar as future medical expenses are concerned because of the manner in which Travis's damages were pled in that count.[11] Count I of the original complaint does allege that

---

11. In its brief, Hopkins argues that

Plaintiffs' substantive argument is premised on the applicability of certain exceptions to the rule laid down in *Garay* . . . . Because they raised that argument for the first time on the eve of trial, Judge Smith, exercising her discretion, dismissed the amended complaint

Travis suffered and will continue to suffer permanent and severe injuries "which have in the past necessitated and will in the future necessitate expenses for: physical therapy and testing, frequent medical evaluation and care, medical treatment, special functional instruction and personal attendance and care."

Although a pleading should not contain unnecessary evidence, it does need to contain "such statements of fact as may be necessary to show the pleader's entitlement to relief." Md. Rule 2–303(b). The Rule expresses the requirement laid down in *Fletcher v. Havre De Grace Co.*, 229 Md. 196, 200 (1962), that the subject matter of a claim must be stated "with such reasonable accuracy as will show what is at issue between the parties, so that, among other things, the defendant may be apprised of the nature of the complaint he is required to answer and defend."

*Fischer v. Longest*, 99 Md.App. 368, 380, 637 A.2d 517, *cert. denied*, 335 Md. 454, 644 A.2d 488 (1994). Travis alleged that Hopkins had a duty toward him, that it breached that duty by mishandling him both pre- and post-operatively, that the breach caused injuries to him, and that he was entitled to damages as a result, including medical expenses. Admittedly, the damages were pled in a conclusory fashion. If appellee desired specifics, it should have filed a motion for a more definite statement.[12] *See General Fed. Constr., Inc. v. D.R. Thomas, Inc.*, 52 Md.App. 700, 705, 451 A.2d 1250 (1982). Appellee also could have made a motion to dismiss for failure

---

and refused to hear evidence on the point. That decision disposes of this case.

Later, Hopkins writes, "The Plaintiff's failure to raise their *Garay* claims in a timely fashion is itself dispositive of this appeal."

12. "If a pleading to which an answer is permitted is so vague or ambiguous that a party cannot reasonably frame an answer, the party may move for a more definite statement before answering. The motion shall point out the defects complained of and the details desired." Md. Rule 2–322(d).

to state a claim upon which relief can be granted.[13] Appellee, however, never made either motion. Accordingly, that argument is waived.

### C. Post-Majority Expenses

The trial judge also held that Travis had no claim for post-majority medical expenses because, "[i]n effect, this child will never be emancipated He will be[,] under *Presley v. Presley,* a child who is always dependent on his adult parents." As demonstrated below, this holding involves circular reasoning, *i.e.,* Travis has no cause of action for post-majority expenses; therefore, he will be dependent on his parents. This begs the question of whether he does have a cause of action for post-majority medical expenses. If he does, then Hopkins would be required to pay those expenses, and he obviously would not be dependent on his parents for the cost of post-majority medical care.

■■■ As already noted, a minor generally does not have a cause of action for medical expenses because the "parents possess the exclusive right to recover a minor's pre-majority medical expenses." *Garay, supra,* 332 Md. at 367, 631 A.2d 429. Parents do not, however, have the *primary* responsibility for post-majority medical expenses of their children. An adult child is primarily liable for his or her own medical expenses. Appellee argues, however, that FL § 13–102[14]

---

13. Md. Rule 2–322(b). This defense may be raised "in any pleading or by motion for summary judgment under Rule 2–501 or at the trial on the merits." Md. Rule 2–324(a). It may not be raised, however, for the first time on appeal.

14. The statute provides in full:

§ 13–102. Prohibited acts; penalties.

(a) *Duty to support destitute parent.*—If a destitute parent is in this State and has an adult child who has or is able to earn sufficient means, the adult child may not neglect or refuse to provide the destitute parent with food, shelter, care, and clothing.

(b) *Duty to support destitute adult child.*—If a destitute adult child is in this State and has a parent who has or is able to earn sufficient means, the parent may not neglect or refuse to provide the destitute adult child with food, shelter, care, and clothing.

abrogates this principle for a destitute incompetent adult, making the incompetent adult's parent responsible for his or her food, shelter, care, and clothing.

This Court held in *Presley v. Presley*, 65 Md.App. 265, 500 A.2d 322 (1985), that the duty of support, which arises "when the child has insufficient resources and, because of mental or physical infirmity, insufficient income capacity to meet his *reasonable* living expenses," may be enforced in equity. *Id.* at 277–78, 500 A.2d 322 (emphasis in original). As noted above, the trial court relied on *Presley, supra,* in denying Travis's claim for his post-majority expenses. This reliance was misplaced, because nothing in *Presley* or in the statute makes a parent primarily liable for the medical expenses of an adult child.

Section 13–102(b) of the Family Law Article places upon an adult child's parents a contingent responsibility for the adult child's medical expenses if the adult child is destitute and cannot pay them. This criminal statute does not purport to take away anyone's civil cause of action. Furthermore, the contingent responsibility would not normally be expected to come into play if injury is caused by the negligence of a solvent third party and if the tort system works as it should. Tort recovery is designed, *inter alia,* to prevent an injured party from becoming destitute and a burden upon innocent third parties. Hopkins is responsible for the fair, reasonable, and necessary cost of Travis's post-majority medical expenses caused by its negligence. Having been adjudged negligent, Hopkins can be expected to pay any damages that a jury assesses against it for such future post-majority medical expenses. When Travis collects these damages, plus the $350,-000 already awarded, there is no reason to believe that Travis

---

(c) *Penalties.*—A person who violates any provision of this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year, or both. "Destitute adult child" is defined as an adult child who "(1) has no means of subsistence; and (2) cannot be self-supporting, due to mental or physical infirmity." FL § 13–101(b).

will be dependent on his parents for these expenses because of destitution.

■ Under appellee's theory, any adult injured by another's negligence would have no cause of action for medical expenses if three conditions were met: 1) the injured party is, at the time suit is brought, destitute; 2) the injured party has a parent or an adult child living in this state who is able to earn sufficient means to support the injured party; and 3) the injury is severe enough so that the injured party in the future will be unable to support himself. To say the least, application of FL § 13–102 in the suggested manner would have bizarre results. As just one example, a sixty-year-old father, who is paralyzed, unable to work, and destitute due to the negligence of a rich or well-insured defendant, would be denied recovery for medical expenses if the defense could prove that the plaintiff's forty-year-old son lived in Maryland and had the ability to earn enough to support his father and pay his medical bills. This would be an illogical result and one not contemplated by the legislature when FL § 13–102 was enacted. The cardinal rule of statutory construction is to effectuate legislative intent, and in ascertaining that intent we "adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987). For these reasons we reject appellee's interpretation of FL § 13–102.

Appellee also argues that Travis will have no post-majority expenses because "the jury found that Travis will not survive to the age of majority." Appellee's argument is based on the jury's negative response to the following special interrogatory, included on its verdict sheet:

Do you find by a preponderance of the evidence that Travis Pepper's life expectancy is such that he will likely live to an age at which a person could ordinarily become gainfully employed?

■ The jury was asked to answer this question in light of Travis's claim for future lost wages. By answering "No," the

jury did not have to continue its deliberations and make an award for future lost income. In other words, because the jury found that Travis would not survive to an age at which a person could ordinarily become gainfully employed, he had no damages for future lost income. The question does not, however, indicate that the jury found Travis would not survive to the age of majority. The record contains nothing to indicate that the term "age of majority" is equivalent to "age at which a person could ordinarily become gainfully employed." Therefore, the jury simply did not decide the issue of whether Travis would live to be eighteen.

## II.

### A. *Limitation of Dr. Brownlee's Testimony*

One of the key contested issues at trial was Travis's life expectancy, which bore on his damages for future lost income. Appellants attempted to elicit testimony from their expert witness, Dr. William J. Brownlee, that Travis had a "normal" life expectancy. Appellants argue the trial judge committed reversible error when she excluded this testimony.

Appellants called Dr. Brownlee to testify as an expert in the field of forensic pathology and general surgery, both pre- and post-operative. The following colloquy occurred at the bench:

> [COUNSEL FOR APPELLANTS]: ... I would also want to offer him on life expectancy, but you ruled yesterday, I think, that since Dr. Cerino hadn't evaluated the patient, that he could not so testify.... [Dr. Brownlee] has not evaluated the patient ... but I would be offering him on that as well.[ 15]

---

15. The previous day, appellants had called Dr. Michele Cerino as an expert in the field of surgery and attempted to elicit an opinion as to Travis's life expectancy. Counsel for appellee objected, stating:

> There are factors that must be considered when determining what a child's life expectancy is.... There's been no testimony as to where Travis stands today on those factors and for this witness to express an opinion as to Travis' life expectancy, without any foundation of that

[COUNSEL FOR APPELLEE]: He's never laid eyes on the boy.

. . .

THE COURT: I have the same ruling.

Appellants' counsel then proffered that, had Dr. Brownlee been allowed to testify, he would have stated that Travis has a normal life expectancy.

Dr. Malek Derakshani, Travis's treating physician, testified as an expert on pediatric cardiology. Hopkins's counsel objected to Dr. Derakshani expressing an opinion on Travis's life expectancy. The trial judge ruled that a doctor who had treated Travis would be able to testify as to Travis's life span but expressed concern that Dr. Derakshani was not familiar with studies, statistics, and other literature on persons with Travis's problems. After further qualification, Dr. Derakshani was permitted to testify that Travis has a normal life expectancy.

Appellants allege the trial court's ruling that Dr. Brownlee could not give an opinion as to Travis's life expectancy prejudiced them because Hopkins was able to elicit testimony on that issue from two expert witnesses.[16] First, Hopkins called

---

sort, is wholly speculative and would be very prejudicial and I think . . . improper.

Appellee's counsel stressed that Dr. Cerino had never personally examined Travis. Appellants' counsel then said, "I will concede that the best person" to testify as to Travis's life expectancy "is his treating physician, who sees him all the time." The trial judge responded, "Well, why don't we save it for that doctor?"

Appellants do not contend that the trial court erred by excluding Dr. Cerino's testimony on life expectancy.

16. Appellee also attempted to elicit on cross-examination an opinion from Dr. Lyons, a general thoracic surgeon called as appellants' witness, as to Travis's life expectancy. Appellants objected, and the following occurred:

[COUNSEL FOR APPELLANTS]: Your Honor, this Court has repeatedly disallowed any physician, who has not examined him, from testifying in any area concerning [life expectancy]. And this was never gone into in direct examination and this witness was never offered for that. . . .

Dr. Edward B. Clark as an expert on pediatric cardiology. Dr. Clark had examined Travis at Hopkins several times prior to Travis's surgery. When appellee's counsel asked Dr. Clark to express an opinion as to Travis's expected life span, counsel for appellants objected. The following then occurred:

[COUNSEL FOR APPELLANTS]: Your Honor has previously ruled that only those who have examined Travis can testify on life span.

[COUNSEL FOR APPELLEE]: He examined him.

[COUNSEL FOR APPELLANTS]: No, only way back when, in 1987; not recently.

[COUNSEL FOR APPELLEE]: He has examined him. He is definitely qualified from the standpoint of education and training, and he has had a hand on him. He was the guy who diagnosed this child, for heavens sake.

[COUNSEL FOR APPELLANTS]: If he can testify based on his examination of the child, fine; but we have proffered four [sic] experts who, based on their training and knowledge of the same type of information that he has available, were ready to opine that Travis Pepper would have a long and normal life span. So if he is going to testify as a result of his examination and no other studies, that's fine; otherwise, it would be very unfair to the Plaintiff's side.

THE COURT: Okay, well, he has examined the child. He is also an expert in pediatric cardiology familiar with the particular anomalies that this child experienced. And again, he is familiar generally with life span issue. I think he is more than qualified to testify on the issue. Your objection is overruled.

Dr. Clark ambiguously opined that "it is unlikely that [Travis] will live beyond his late teens or 20s."

---

THE COURT: It is beyond the scope of direct, certainly she hasn't gotten into that at all. And second ... [in an] attempt to maintain some level of consistency with respect to the life expectancy questions and he hasn't seen him and he hasn't said it so I'm going to sustain her objection.

Dr. Ross Ungerleider was called to testify for Hopkins as an expert in pediatric cardiac surgery. Appellants objected to him testifying as to Travis's life expectancy and the following occurred:

[COUNSEL FOR APPELLANTS]: He's never examined this patient. . . . We've had five [sic] experts excluded from testifying because they're [sic] not examined the patient and I would ask the Court to do the same in this situation, as to life expectancy.

[COUNSEL FOR APPELLEE]: I think the question is really one of proper foundation in this serious case. With respect to her experts, part of our objection was that the doctors hadn't examined the child, but a major part of it . . . is that there are certain aspects of the child's condition that were not known to those experts, or at least proffered [sic] at the time that they testified . . . I think that this doctor, given his training and experience, his knowledge of the course of these children, the fact that he treats them every day, combined with the information testified to by Dr. Derakshani, is a perfectly sufficient basis for him to testify regarding life expectancy issues.

[COUNSEL FOR APPELLANTS]: Absolute [sic] is not. All of our experts are basing their opinions on the same information that he wants to use, the very same. And we were excluded from doing that.

THE COURT: I think that there's one big difference. This is somebody who has treated patients who have the same condition and has done surgery on patients who have the same condition.

Dr. Ungerleider was permitted to express an opinion as to Travis's life expectancy, stating that Travis would live only until he was about 15 or 20.

The admissibility of expert testimony is within the sound discretion of the trial court, and its action will seldom constitute a ground for reversal. *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977). The trial court's determination is reversible "if it is founded on an error of law or some

serious mistake, or if the trial court clearly abused its discretion." *Impala Platinum Ltd. v. Impala Sales, Inc.,* 283 Md. 296, 332, 389 A.2d 887 (1978). Expert testimony may be admitted at trial if it

> will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine . . . whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, . . . and . . . whether a sufficient factual basis exists to support the expert testimony .

Md. Rule 5–702. It is not necessary for a proposed witness to have been personally involved in the activity about which he intends to testify as long as he has demonstrated a special and sufficient knowledge of the activity. *Radman, supra,* 279 Md. at 170, 367 A.2d 472 (allowing an internal medicine specialist to express an opinion on the performance of an abdominal surgical procedure even though he had never performed one himself).

■ The trial judge clearly recognized the importance of an expert being acquainted with Travis and his cardiac disorder in order to express a meaningful opinion of its effect on Travis's life expectancy. Dr. Brownlee had never examined Travis. The trial judge also recognized the importance of training, education, or experience in dealing with patients with the same or similar defects as Travis in order to express a meaningful opinion as to how long Travis might live. Dr. Brownlee had never managed a three-month-old child's care after open-heart surgery, had never performed surgery to correct tetralogy of Fallot with pulmonary atresia, and had not handled pediatric cases in the past ten years. We find no abuse in discretion in not allowing Dr. Brownlee to express an opinion as to Travis's life expectancy.

■ Further, appellants were able to introduce life expectancy testimony through Dr. Derakshani, Travis's treating physician. Appellants have failed to show that they were prejudiced by the exclusion of Dr. Brownlee's life expectancy testimony. *Bradley v. Hazard Technology Co.,* 340 Md. 202,

206, 665 A.2d 1050 (1995) (unless an appellant can demonstrate that a prejudicial error occurred below, reversal is not warranted); *Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005 (1977) (burden of demonstrating both error and prejudice is on the complaining party). *See also, Bailey v. State,* 63 Md.App. 594, 610, 493 A.2d 396, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985) (holding that because appellant was permitted to elicit same evidence from other witnesses, any error in limiting cross-examination of forensic serology expert was harmless). Dr. Brownlee's testimony would have been cumulative; therefore, the exclusion of his testimony would not be a ground for reversal.

### B. *Allowance of Dr. Clark's Testimony*

Appellants contend that the trial judge erred by allowing Dr. Clark to "render opinions on Travis' life expectancy based on findings in the Baltimore–Washington Infant Study; a study that Dr. Clark opined was not a reliable authority but rather only a *reliable estimate* of life expectancy." (Emphasis in original.) Statements made in a learned treatise are admissible as an exception to the hearsay rule if established as a reliable authority by the testimony or admission of the witness. Md. Rule 5–803(b)(18).[17]

First, appellants did not object at the proper time to Dr. Clark's opinion. We quote from the transcript:

[COUNSEL FOR APPELLEE]: Based on those factors, do you have an opinion today as to what Travis Pepper's life expectancy is today?

[COUNSEL FOR APPELLANTS]: Objection.

THE COURT: Overruled.

---

17. Maryland Rule 5–803(b)(18) provides that a statement is admissible as an exception to the hearsay rule [t]o the extent ... relied upon by the expert witness in direct examination, [if] contained in a published treatise, periodical, or pamphlet on a subject of history, medicine, or other science or art, [which is] established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice.

THE WITNESS: I do.

BY [COUNSEL FOR APPELLEE]:

Q What is that?

A That it is unlikely that he will live beyond his late teens or 20s.

The proper time to object would have been to the question that was directed to eliciting the opinion, not the question that was directed to discovering whether the expert had an opinion.[18] *Shpak v. Schertle,* 97 Md.App. 207, 219, 629 A.2d 763, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993) (holding that objection to question asking expert "do you have an opinion" was properly overruled and that no objection was made to "crucial question, 'what is that opinion' ").

■ Assuming, *arguendo,* that the objection had been preserved, we find that Dr. Clark clearly stated that the Baltimore–Washington Infant Study ("BWIS") was reliable.

THE COURT: Doctor, with respect to the Baltimore–Washington Infant Study, do you consider that a reliable authority?

THE WITNESS: I consider that a reliable estimate of a larger field of all children. That's a sample. And so we use samples statistically. We use samples when we try to determine many things in the world. And what I showed you was a sample of experience here in the Baltimore–Washington area. It does not include every case of pulmonary atresia . . . in the United States, or Europe, or Africa, or Asia, or South America, but it is a reasonable estimate.

---

**18.** Appellants again made no objection a few minutes later when the trial judge directed that the testimony be repeated after becoming aware that a technical difficulty may have turned off the recording device.

[COUNSEL FOR APPELLEE]: . . . [D]o you have an opinion today as to Travis Pepper as he is today, what his life expectancy is?

A Yes, I do.

Q What is that opinion?

A My opinion is that it is unlikely that he will survive beyond his late teens or 20s.

And I expect that within certain boundaries, that reasonable estimate would hold up in other areas as well.

If we had every case that had ever occurred in the world, and we had it in one place—which of course, we never will because we can never collect all of those cases, then that would be authoritative. *But in the absence of having every case, every piece of information, then we have to make judgments. I think that it is reliable, but I certainly wouldn't consider it authoritative.*

(Emphasis added.)

Dr. Clark was attempting to define what he meant when he said the BWIS was not "authoritative." In doing so, he called it reliable. We find no error in the admission of his opinion.

**JUDGMENT AGAINST JOHNS HOPKINS HOSPITAL IN THE AMOUNT OF $350,000 FOR NON-ECONOMIC DAMAGES AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL AS TO THE AMOUNT, IF ANY, TRAVIS PEPPER IS ENTITLED TO RECOVER FOR MEDICAL EXPENSES; COSTS TO BE PAID 75% BY APPELLEE AND 25% BY APPELLANTS.**